IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINA MATEER,<br><br>  Plaintiff,<br><br>  v.<br><br>INTEROCEAN AMERICAN SHIPPING<br>CORP. and DOES 1–25,<br><br>  Defendants.<br>                                                              / | No. C 06-01642 WHA<br><br>**ORDER DENYING MOTION TO<br>DISMISS FOR LACK OF<br>PERSONAL JURISDICTION** |

## INTRODUCTION

Defendant Interocean American Shipping Corp. moves to dismiss this action for lack of personal jurisdiction over Interocean. Immediately prior to the instant litigation, defendant operated three oceangoing ships based in the San Francisco Bay, employed two dozen people here, leased real estate in Alameda and was registered to do business in California for more than sixteen years. The assertion of general jurisdiction over defendant is therefore justified. The motion is **DENIED**.

## STATEMENT

Defendant concedes that this order must take as true all undisputed allegations in the complaint and resolve all conflicts between the parties' declarations in plaintiff Christina Mateer's favor (Br. 4, citing *Amer. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996)).

1     This action arose out of alleged sexual harassment, retaliation and Jones Act negligence
2  during plaintiff's employment as a steward aboard the M/V Patriot Pacific Gulf Marine, a ship
3  that was operated by IUM, a name under which defendant did business (Compl. 1, ¶ 7).  A
4  ship's steward is in charge of provisions and dining arrangements.  All of the acts that gave rise
5  to the complaint occurred outside California, during a voyage from Europe to Brunswick,
6  Georgia, from November or late October 2004 to November 26, 2004 (Rogers Decl. ¶¶ 9–11
7  (Mar. 6, 2006) ("Rogers Decl. I")).

8     Defendant is incorporated in Delaware and headquartered in New Jersey.  It operates
9  ships under contract with the United States government and shipowners (Rogers Decl. I ¶¶ 2,
10 5–6).  On March 9, 1989, defendant registered to conduct business in California as an out-of-
11 state corporation.  As of September 3, 2004, January 6, 2006, and March 10, 2006, defendant's
12 registration status was "active" and it had an agent for service of process in Alameda
13 (Stephenson Decl. ¶ 5, Exh. D).

14    On April 28, 2000, defendant began performance of a contract with the U.S. Maritime
15 Administration to operate three ships, the Mt. Washington, Cape Mohican and Cape Fear.  The
16 ships were part of the Ready Reserve Fleet, which stood on alert to support any rapid
17 deployment of U.S. military force (Rogers Decl. I ¶14).  Defendant thus became the employer
18 of the ships' crews, although the location of the ships was controlled by the Maritime
19 Administration (*id.* ¶ 15; Stephenson Decl., Exh. B (Jt. Statement of Stipulated Facts re Def.'s
20 Mot. for Summ. J. ¶ 1, *Dixon v. Interocean Ugland Management Corp.*, No. CGC 04 432882
21 (Cal. Super. Ct. Mar. 14, 2006).[1]

22    Defendant operated the Cape Fear and Cape Mohican out of a home port in Alameda,
23 California, for the entire period of the contract, April 28, 2000, to July 28, 2005.  In January
24 2002, the Maritime Administration ordered the Mt. Washington from Texas to San Francisco.
25 It was here until the end of the contract, except for about five to six weeks in Oregon in late
26 2002 and about two months off the coast of South America in the first half of 2004 (Rogers

---

[1] Interocean Ugland Management Corp. was the same entity as Interocean American Shipping Corp.  It used different names at different times (Rogers Decl. I ¶¶ 2–3).

2

Decl. I ¶ 16; Rogers Decl. ¶¶ 14, 16 (Mar. 30, 2006) ("Rogers Decl. II"); Stephenson Decl. ¶ 3, Exh. B ¶ 3).[2]

While the ships were stationed in California, defendant employed their approximately 23 crewmembers, plus two to three port engineers (one per ship). One, and later two, of the engineers worked out of shoreside space in Alameda that was leased by defendant. The other engineer worked out of a shared trailer on Pier 50 in San Francisco. Defendant deducted California payroll taxes from the wages of the engineers and carried California workers compensation insurance for them. No taxes were deducted from the wages of the crewmembers, nor was workers compensation insurance carried for them. In 2004, defendant reported that it earned about six percent of its revenue in California (Rogers Decl. I ¶¶ 17, 19; Rogers Decl. II ¶¶ 7, 17; Stephenson Decl. ¶ 3, Exh. B, ¶¶ 1, 8).

Defendant had no connections to California other than those described above during the time period in which plaintiff's claims arose and in the decade immediately preceding it.

Plaintiff filed a complaint against defendant in Alameda County Superior Court on January 18, 2006. Although she did not cite to specific statutes, the complaint clearly states two claims for employment discrimination, one under 42 U.S.C. 2000e-2(a) (sexual harassment) and another under 42 U.S.C. 2000e-3(a) (retaliation). A third claim was for maritime negligence pursuant to 46 App. U.S.C. 688 (Compl. 1, ¶¶ 11–22). A state-court summons and the complaint were served upon defendant January 31. On March 1, defendant removed the case to district court, asserting that the court had diversity and federal-question subject-matter jurisdiction (Notice of Removal of Action 1, ¶¶ 2–4; Summons).

**ANALYSIS**

A court may not adjudicate claims against a party unless it has personal jurisdiction over the party. A plaintiff typically consents to a court's jurisdiction by filing suit with it. A defendant, however, may contend that it is not subject to the plaintiff's chosen forum. A

---

[2] In an attempt to minimize its contacts with Northern California, defendant states that two of the three ships went to sea during the contract period (Br. 10). There is only evidence that one ship went to sea during that period. Defendant offers no evidence to support the contention that a second ship also left port. For purposes of this motion, therefore, the Court bases its analysis on just one ship going to sea.

3

1  defendant may move pursuant to Federal Rule of Civil Procedure 12(b)(2) to dismiss a
2  complaint for lack of personal jurisdiction over it.  Upon such motion, the plaintiff can only
3  prevail by making out a prima facie showing of facts sufficient to establish jurisdiction.  Even if
4  the plaintiff prevails at this stage, however, she must prove the jurisdictional facts by a
5  preponderance of the evidence at trial.  *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d
6  1280, 1285 (9th Cir. 1977).

　　　　The typical personal-jurisdiction analysis begins by asking whether there is a rule or statute that potentially confers jurisdiction over defendant. *Go-Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406, 1413 (9th Cir. 1989).  If so, the inquiry moves to whether asserting jurisdiction will offend due process.  In that regard, the court must decide whether to analyze the case under the Fifth Amendment or under the Fourteenth Amendment.  In diversity-jurisdiction cases, the court applies the Due Process Clause of the Fourteenth Amendment, which constrains the exercise of power by the various states. *Int'l Shoe Co. v. Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 311.  In a federal-question case in federal court, the Fourteenth Amendment is not implicated because the power of the states is not at issue.  Instead, the court applies the Due Process Clause of the *Fifth* Amendment, which constrains *federal* — but not state — power. *Go-Video, Inc.*, 885 F.2d at 1413.[3]

　　　　In most cases, a Fifth Amendment analysis of personal jurisdiction is almost identical to a Fourteenth Amendment inquiry.  Both protect individual liberty against government overreaching.  There is, however, one crucial difference.  The Fourteenth Amendment analysis is designed to balance the interests of the states by ensuring that they "do not reach out beyond

---

[3] There is also a subcategory of federal-question cases, concerning foreign entities with such weak connections to each individual state that they would not be subject to jurisdiction in any one of them.  Personal jurisdiction in such actions is analyzed under the Fifth Amendment, as in federal-question cases involving only U.S. defendants.  The *statutory* analysis, however, is different in these foreign-entity cases.  Normally, the summons and complaint are served on the authority of state statutes. *E.g.*, Cal. Civ. Proc. Code § 410.10.  Such state statutes have no power over someone without sufficient connections to the individual states. *See, e.g.*, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980).  Instead, service is accomplished through Federal Rule of Civil Procedure 4(k)(2), which allows service on anyone who is not subject to the jurisdiction of any state.  Cases in which service is affected pursuant to this rule are thus analyzed under a different *statutory* framework than the instant motion.  They share, however, a common *constitutional* rule: the Fifth Amendment.

4

the limits imposed on them by their status as coequal sovereigns in a federal system." Fourteenth Amendment inquiry therefore requires analysis of the "forum State's interest in adjudicating the dispute," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies[][,] and the shared interest of the several States in furthering fundamental substantive social policies." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92 (1980). The Fifth Amendment inquiry, by contrast, does not balance the states' interests because there are no comparable state interests implicated in federal-question cases in federal court. Analysis of the factors listed above is therefore inappropriate in a federal question cases heard in federal court.

Under the Fifth Amendment, jurisdiction is proper if it is reasonable and the defendant has sufficient contacts with the territory of the court. When the plaintiff's claim arose from the defendant's activities in or impacts upon the forum, the court must consider the connections between the defendant, the litigation and the forum. If the court finds that there are sufficient contacts and that assertion of jurisdiction is reasonable, then it has a type of personal jurisdiction called "specific jurisdiction."

But when the activities giving rise to the claim had no connection to the forum, the court must consider whether the defendant's contacts with the forum were pervasive enough, at the time the suit was commenced, for the court to have "general jurisdiction" over the defendant. *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 913 (9th Cir. 1990) (only relevant contacts are those before litigation started). General jurisdiction allows the court to assert jurisdiction over a defendant to adjudicate any and all claims against it — no matter where they arose. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–15 (1984). Because general jurisdiction is so broad, the defendant's contacts with the forum must be more extensive than would be required under a specific-jurisdiction test. The defendant must have "minimum contacts" with the geographical area over which the court has jurisdiction "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *See Milliken v. Meyer*, 311 U.S. 457, 463 (1940). The defendant's contacts with the area also must be "substantial, continuous, and systematic."

5

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002). In addition, defendant's contacts with the area cannot be based on the unilateral activity of another party or of a third person. *Helicopteros Nacionales*, 466 U.S. at 414–15. Random, fortuitous and attenuated contacts are not enough. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

If the plaintiffs shows that there are sufficient minimum contacts, the defendant may nevertheless defeat the claim of personal jurisdiction by "presenting a compelling case that jurisdiction would be unreasonable." *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1397 (9th Cir. 1986).

For the instant motion, there is no need to inquire whether there is a rule or statute that potentially confers jurisdiction over defendant. Interocean did not claim in its motion that the court lacks a statutory basis for asserting jurisdiction. (Nor did it claim that service of process was deficient or improper.) It claimed only constitutional deficiencies. In its supplemental brief, however, it discusses statutory issues extensively. The brief arguably raises statutory objections to the assertion of jurisdiction over Interocean. Such objections may not be raised in supplemental briefing to which plaintiff has no opportunity to respond. The Court therefore treats all statutory arguments against the assertion of person jurisdiction as waived, at least for the purposes of this motion.[4]

This order holds that the Fifth Amendment applies. Defendant removed the case based on both diversity of citizenship and federal-question subject-matter jurisdiction. Normally, when subject-matter jurisdiction is based on diversity of citizenship, the court can maintain personal jurisdiction over a defendant if it does not offend the Fourteenth Amendment Due Process Clause. *See, e.g.*, *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 440 (1952). It is true that there is complete diversity in the instant case. That is irrelevant to this Court's

---

[4] This waiver almost certainly does not affect the result. Service was affected pursuant to California Civil Procedure Code Section 410.10. That statute allows courts to exert power to the outer limits of that allowed by the federal and state constitutions. Interocean's extensive contacts with California, as discussed below in the main text, likely would make it subject to personal jurisdiction here under the state constitution. The federal constitutional limits incorporated within Section 410.10 are co-extensive with those imposed by the Constitution, which are discussed in the text below.

6

subject-matter jurisdiction, however, because none of plaintiff's claims is founded on state law. They are all founded on federal statutes. State power therefore is not at issue and the Fifth, not the Fourteenth, Amendment controls. Defendant concedes in its supplemental brief that it was wrong to contend in its original motion and reply that the Fourteenth Amendment governed personal jurisdiction in this case. It agrees now that the Fifth Amendment governs.

Having determined that the Fifth Amendment applies, this order now considers the defendant's contacts with this area. Plaintiff concedes that her claims arose entirely outside of California and that therefore this Court has no specific jurisdiction over defendant in this action. She contends correctly, however, that defendant had contacts here of a degree and nature sufficient to give this Court general jurisdiction over Interocean.

The reasons are manifold. First, the contacts were substantial and continuous. For sixteen years immediately preceding this litigation, defendant was registered to conduct business in California and had an agent here for service of process. For five years immediately preceding this litigation, it operated two ships that — for all the evidence shows — never left San Francisco Bay. For three-and-a-half years immediately before the complaint was filed, defendant operated a third ship that was based in San Francisco and which left here for no more than about three-and-one-half months. These were major, oceangoing vessels.

In addition, defendant employed and paid the wages of the ships' approximately twenty-three crew members and the two to three engineers. It leased an office for engineers in Alameda. It made local payroll tax deductions for these three and carried workers compensation insurance for them. Defendant earned six percent of its 2004 revenue in California.[5] These contacts were part of a systematic effort of defendant to perform a revenue-generating contract at the heart of its core business of operating ships. None of these contacts was random, fortuitous or attenuated. They were certainly not "insubstantial and sporadic," as defendant claims (Br. 9). After conducting such extensive business in the area, it is fair and just to hale defendant into court here.

---

[5] There is no evidence of any activity by defendant in California during 2004 outside of the San Francisco Bay area.

7

Defendant claims that it did not establish a regular place of business here. That is flatly contradicted by evidence that it kept three ships moored to the piers, without any evidence that the crews of two of them ever cast off during the five-year contract period. It is also torpedoed by the fact that the engineers maintained regular places of business on shore.

Defendant leans heavily on the argument that it did not establish sufficient contacts because it had no control over the location of the ships it operated (*see, e.g.*, Br. 10). The locations were decided by the Maritime Administration, which Interocean had a contractual obligation to obey. Defendant also claims that it was merely the agent of the Maritime Administration and, as such, did not purposefully direct its activities here. It argues that its presence here was the result of "unilateral activity" by the Maritime Administration. Defendant argues that, because it did not make local contact purposefully and because the contacts were due to the "unilateral" activity of the Maritime Administration, they were not jurisdictional contacts at all (Reply 4–5).

This is unconvincing. Defendant's long-term operation of its business here was not an accident. No one forced defendant to enter into a contract with the government. It did so voluntarily. It must be deemed to have yielded to any jurisdictions in which it has carried out those operations to any substantial degree. Moreover, the Court takes judicial notice of the facts that the ports of the San Francisco area collectively had the fifth-highest tonnage and number of vessel calls among U.S. ports in 2002. *See* Maritime Administration, *Vessel Calls at U.S. Ports 2003* (July 2004), *available at* http://www.marad.dot.gov/MARAD_statistics. It therefore was readily foreseeable at the time defendant executed its contract with the Maritime Administration that it might be required to operate ships here.

Defendant claims that this foreseeability was "insufficient under the Due Process Clause" to bring it under the Court's jurisdiction. It is true that "foreseeability *alone* has never been a sufficient benchmark for personal jurisdiction." *World-Wide Volkswagen*, 444 U.S. at 295 (emphasis added). This order does claim that the foreseeability that defendant would operate ships here is sufficient, by itself, to assert jurisdiction over defendant. But there was much more here. Defendant was registered to do business here, had two dozen employees here,

8

1  maintained ships here, paid taxes here and leased real-estate here. That was a far cry from the
2  situation held not to justify the exercise of personal jurisdiction in *World-Wide Volkswagen*. In
3  that case, an Oklahoma state court claimed jurisdiction over a corporation merely because the
4  company had sold cars with the foreseeable consequence that one of them would travel to
5  Oklahoma. *Ibid.* As *World-Wide Volkswagen* itself noted, foreseeability, while not sufficient to
6  create jurisdiction, *is relevant* to the inquiry: "This is not to say, of course, that foreseeability is
7  wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere
8  likelihood that a product will find its way into the forum State. Rather, it is that the defendant's
9  conduct and connection with the forum State are such that he should reasonably anticipate being
10 haled into court there." *Id.* at 297. In the instant case, defendant's conduct and connection with
11 California were such that it can properly be held to account in this Court.

12 Defendant claims that, even if its connections to this area count as jurisdictional
13 contacts, they "were insubstantial given that it had no control" over where the vessels were
14 stationed (Br. 10). This argument proves too much. If true, it would mean that even a one-
15 hundred-year presence of one-hundred ships in San Francisco would not make general
16 jurisdiction here constitutionally permissible, so long as the vessels were here at the order of a
17 contractual partner and not by sole decision of defendant. Such an outcome would be absurd
18 and would allow a defendant like the one here to escape jurisdiction in every port regardless of
19 voluminous business. Furthermore, even if we decrease the significance of defendant's contacts
20 with the Bay Area due to its contract with the Maritime Administration, they still are substantial
21 enough to justify the exercise of personal jurisdiction over Interocean.

22 Defendant also argues that it is not amenable to suit here because it did not purposefully
23 avail itself of the "privilege of conducting activities within the forum State, thus invoking the
24 benefits and protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

25 It is questionable whether purposeful invocation of the "benefits and protections" of a
26 state's laws is as significant in the context of a federal court's handling of federal claims as it
27 was in *Hanson*, where a Florida state court was adjudicating state-law probate issues. *Id.* at
28 238. *Hanson* was thus adjudicated under the Fourteenth Amendment, whereas the instant case

9

1 must be considered under the Fifth Amendment. In the Fourteenth Amendment context, the
2 power of the state is at issue. *Hanson* therefore had to consider the demarcation between the
3 jurisdictional spheres of sovereign states. It thus made sense to see jurisdiction as one half of a
4 quid-pro-quo relationship, whereby the acceptance of benefits under the laws of a state
5 subjected a party to the power of that state's courts. In the Fifth Amendment context, interstate
6 power is not at issue. It is nevertheless relevant to a Fifth Amendment analysis whether or not a
7 defendant availed itself of the benefits of a state's laws. Such an invocation suggests other
8 contacts between the defendant and the state. It ultimately makes it more fair and just to hale
9 the defendant into federal court here.

10 Even if we accord the purposeful-availment requirement the full weight it deserves in
11 diversity and state-law cases, it would not defeat jurisdiction. In the instant case, defendant
12 actively took advantage of the state's laws in several ways. It participated in its taxation system
13 and its workers compensation system. It purposefully benefitted from the state's work to
14 maintain navigable harbors and the piers at the Port of San Francisco. It used state roads that
15 undoubtedly were used by defendant's contractors and workers to reach the ships. Defendant
16 could have chosen to breach its contract with the Maritime Administration and forego all these
17 benefits of California's laws. It did not. That fact supports the exercise of personal jurisdiction.

18 The purposeful-availment issue is a corollary of the requirement that the "unilateral
19 activity of those who claim some relationship with a nonresident defendant cannot satisfy the
20 requirement of contact with the form State." *Hanson*, 257 U.S. at 253. Defendant argues that
21 haling it before this Court is the equivalent of allowing unilateral activity of the Maritime
22 Administration to subject it to suit here. Not true. The activity that sent Interocean here was
23 not unilateral. Defendant and the Maritime Administration were parties to a *bilateral* contract,
24 which eventually required defendant to do business here. Furthermore, although the orders may
25 have originated with the Maritime Administration, they were implemented by defendant. Thus
26 the activities were not unilateral but rather were joint actions of defendant and the Maritime
27 Administration.

28

10

Defendant likens this case to *Helicopteros Nacionales*. In that decision, however, the unilateral activity that the Supreme Court said was not enough to support jurisdiction was the acceptance by Helicopteros Nacionales of checks issued by a co-defendant and drawn on a Texas bank. Because there was no indication that defendant played any role in deciding on which bank the check would be drawn, the court held that the choice was a unilateral decision of the co-defendant. It therefore was not a factor in favor of requiring Helicopteros Nacionales to defend a suit in Texas state court. 466 U.S. at 416–17.

The unilateral actions at issue in *Helicopteros Nacionales* were nothing like the actions Interocean took at the behest of the Maritime Administration. Defendant was more purposeful in its contacts than the mere depositing or cashing of checks drawn on a local bank. As stated, it maintained oceangoing ships, paid workers, registered to do business, filed state tax returns and leased office space here. *Helicopteros Nacionales* does not aid defendant.

Defendant attempts to support the arguments related to its lack of control by citing several decisions in which courts found that they lacked personal jurisdiction over defendants in shipping cases due, in part, to the defendants' lack of control over the ports at which the ships called. All of these decisions are from other circuits, so none are controlling. They are also factually distinguishable.

In several decisions, the defendants had much less substantial contact with the relevant state than did Interocean with California. Typically, they paid only occasional port calls to the state, as contrasted with the semi-permanent stationing in the instant case. The decisions therefore typically found that the contacts were not systematic or continuous. *See Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 787 (5th Cir. 1990) (fewer than twenty port calls by ship while managed by defendant); *Conner v. Bouchard Transp. Co.*, No. CIV. A. 93-450, 1993 WL 388274 at \*3 (E.D. Pa. Sept. 30, 1993) (100 port calls by thirty-six ships over five-year period); *Nicolaisen v. Toei Shipping Co.*, 722 F.Supp. 1162, 1165 (D. N.J. 1989) (seventeen port calls over five years); *Farris v. United States*, 877 F.Supp. 1549, 1555 (M.D. Fla. 1994) ("sporadic" use of Florida ports); *Ginsberg v. Livestock Express, Inc.*, Civ. A. No. 90-1411-N, 1990 WL

11

1  303044 at *5 (E.D. Va. Nov. 9, 1990) (three port calls); *Amer. Overseas Marine Corp. v.*
2  *Patterson*, 632 So.2d 1124, 1130 (Fla. Dist. Ct. App. 1994) ("sporadic" use of Florida ports).

3  In other decisions, there was even less direct contact because the ship never arrived at its
4  intended destination in the forum state. *See Francosteel Corp. v. M/V Charm*, 19 F.3d 624, 626,
5  628 (11th Cir. 1994) (ship sank before arriving in Georgia); *Uni-Petrol Gesellschaft Fur*
6  *Mineraloel Produkte, M.B.H. v. M/T Lotus Maru*, 607 F.Supp. 108, 109 (S.D.N.Y. 1985) (ship
7  never delivered cargo to New York destination).

8  In two decisions, the claim of personal jurisdiction was based not on operations in a
9  forum, as here, but on injection of a defective piece of equipment into a steam of commerce.
10 The courts held that, on that theory alone, manufacturer could not be haled into court where the
11 injury occurred. *Fed. Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 658 (4th Cir. 1989); *DeJames*
12 *v. Magnificence Carriers. Inc.*, 491 F.Supp. 1276, 1280 (D. N.J. 1980). The stream-of-
13 commerce contacts in those decisions were much less extensive and purposeful than was
14 defendant's conduct in the instant case.

15 Contrary to defendant, the final shipping decision cited by it did *not* hold that the court
16 lacked personal jurisdiction, despite only occasional calls at American ports. *W. Africa Trading*
17 *& Shipping Co. v. London Int'l Group*, 968 F.Supp. 996, 1101 (D. N.J. 1997). The holding
18 therefore does not support defendant's position.

19 Defendant also claims that its contacts were not "continuous and systematic" (Br. 10),
20 committing verbicide on the words "continuous" and "systematic." A five-year period of doing
21 business is obviously continuous. So too is a sixteen-year period of registration to do business
22 in California. Defendant's contacts were also systematic, in that employed systems to maintain
23 the ships here, paid the crew here, lease office space here, pay taxes here and earn revenue here.
24 These acts were not random or fortuitous.

25 Defendant makes several other unavailing arguments:

26 • It argues that it "never earned California revenues" (Br. 10). But in 2004, it
27 reported that it earned about six percent of its revenue in California (Rogers
28 Decl. II ¶ 7). Defendant thus defeats its own argument.

12

- While it is true, as defendant asserts, that it did not advertise or solicit business in California, those facts do not eviscerate this Court's jurisdiction over defendant, given the otherwise substantial contacts between it and Northern California.
- Defendant asserts that it "is not an operation so enmeshed in California's business that its contacts here 'approximate physical presence,'" (Br. 11), a requirement for assertion of personal jurisdiction. *See Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). Indeed, its contacts did not *merely approximate* physical presence — Interocean *actually was* present in California.
- Defendant notes its current lack of contacts with California. This is irrelevant. The only contacts that matter are those existing at or before the beginning of the litigation. *Farmers Ins. Exch.*, 907 F.2d at 913.
- Defendant argues that its contacts are insufficient because it only maintained its registration as a foreign corporation because it was cheaper to do so than to terminate it when it left the state, then restart it when it returned. This argument implicitly concedes that defendant expected (and expects) to do business in California again. Furthermore, defendant offers no authority for the proposition that maintaining a registration to do business becomes jurisdictionally irrelevant when it is done to save money.

\*     \*     \*

Given that plaintiff has created a presumption of reasonableness by carrying her burden, this order must evaluate whether defendant nevertheless has defeated the claim of personal jurisdiction by "presenting a compelling case that jurisdiction would be unreasonable." *Haisten*, 784 F.2d at 1397.

*First*, defendant asserts that jurisdiction is unreasonable because, even if its contacts were purposeful, the "degree of purposefulness . . . is minuscule" (Reply 10). This argument is unpersuasive for the same reasons that these contacts cannot be disregarded in examining

13

minimum contacts. One of these reasons is that Interocean's obligation to obey the Maritime Administration was due only to its voluntary and purposeful execution of a bilateral contract with the government.

*Second*, defendant claims that jurisdiction would not be reasonable because the United States, not it, is the proper defendant in this action (Reply 11). Whatever the merits of this argument, it has nothing to do with this Court's general jurisdiction over defendant. General jurisdiction concerns a defendant's contacts with a forum generally, not his amenability to liability for a particular claim.

*Third*, defendant makes the puzzling claim that jurisdiction is unreasonable because "California should not have an interest in the outcome of this litigation" (Reply 11). A state, however, has an interest in adjudicating claims raised by its citizens. Defendant conceded that plaintiff "was and still is a citizen of the State of California, as she alleges in her Complaint" (Notice of Removal ¶ 5). Defendant thus defeated its own argument. In any case, whatever merit this argument would have under the Fourteenth Amendment, it has none under the Fifth Amendment jurisdictional analysis.[6]

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss for lack of personal jurisdiction is **DENIED**. A prima facie showing of personal jurisdiction has been made, subject to further proof on summary judgment or trial. This decision moots defendant's request to

---

[6] Plaintiff asserted in her complaint that she "was at all times mentioned herein a resident of the State of California (Compl. ¶ 1). That contention was not controverted by defendant's submission of a declaration that the address plaintiff gave on her EEOC Charge of Discrimination and her declaration in support of the charge is actually the address of a United Parcel Service store (Tamulski Decl. ¶¶ 4–5). Her use of a post-office box does not suggest that she is not a citizen, resident or domiciliary of California. Many people use post-office boxes as their mailing addresses despite also having a residence in the same state. Furthermore, this UPS address was given by plaintiff *after* the claim arose. Her assertion in the complaint that she was a resident of California when the allegedly unlawful actions took place is not called into question by whatever address she claimed several months later.

14

transfer for want of personal jurisdiction, plaintiff's request for jurisdictional discovery and plaintiff's objections to defendant's reply brief.

**IT IS SO ORDERED.**

Dated: April 17, 2006

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE